CULPEPPER, Judge.
Mr. Leroy Joseph Meche was killed, and his 16 year old son, Alton Joseph Meche, was seriously injured, when the television antenna they were raising in a trailer park came in contact with defendant’s electric line. Mr. Meche’s widow sues individually and as natural tutrix of their three minor children, including Alton Joseph Meche. Three major children of Mr. Meche also join as plaintiffs. A jury found the defendant utility company was not negligent, and that its electric line did not create an unreasonable risk of harm. From a judgment rejecting their demands and dismissing their suit, plaintiffs appeal.
*1317 The substantial issue is whether the jury was clearly wrong in its finding of fact that the defendant’s electric line did not create an unreasonable risk of harm.
On February 14, 1980, one of Mr. and Mrs. Leroy Meche’s daughters, Patricia Meche Naquin, and her husband moved their trailer home from Carlyss, Louisiana to the Atherton Trailer Park on Bayou DTnde Road near Sulphur, Louisiana. The next afternoon, Mr. Naquin, assisted by friends, leveled the trailer. Later in the afternoon Mr. and Mrs. Leroy Meche and their minor children, and also their married daughter, Tina Meche Midkiff, and her husband, Ricky, arrived for a visit. They all had a gumbo supper in the Naquin trailer home.
After supper they were watching television, and the reception was poor. Dale Naquin, Joey Meche, Ricky Midkiff and Mr. Leroy Meche drove in Leroy’s truck to Car-lyss and picked up the Naquin television antenna, which had not yet been moved to the new site. About 8:30 or 9:00 p. m., during hours of darkness, the three men and Joey were erecting the antenna on the north side of the trailer. The antenna was 27 feet 10% inches long and was made of metal pipe. Naquin was on a ladder next to the north wall of the trailer. Leroy Meche, Ricky Midkiff and Joey Meche were raising the antenna toward Naquin. The top of the antenna struck Gulf States’ 7,600 volt uninsulated electric line, which was approximately 23 feet above ground level. Mr. Leroy Meche was killed instantly, and Alton (Joey) Meche was seriously burned.
The electric line which caused the accident had been installed in July of 1979 at the request of the trailer park owner, Mr. Charles H. Atherton. The trailer park fronts approximately 176 feet on the north side of Bayou DTnde Road and runs back in a northerly direction between parallel lines approximately 250 feet. A service road, 20 feet in width, runs north and south approximately through the center of the park. Each trailer space is about 50 feet in width, fronting on the service road. There was an existing electric line running along the west boundary of the trailer park servicing the trailers on the west side of the service road. Atherton applied for an additional line to service three trailers on the east side of the service road and located in the northern portion of the park. Atherton and Jeffrey Fulton, Gulf States’ service representative, originally selected a route for the line running from Bayou DTnde Road, thence northerly along the western boundary of the trailer park next to the adjoining property of C. D. Lewis, and thence along the northern boundary of the trailer park, also adjoining property of C. D. Lewis, to a pole on the northeast corner of the park. However, C. D. Lewis refused to give permission for the location of the new line along the eastern and northern boundaries of the park. Gulf States then changed the plan to run the line from the existing line on the west boundary of the park to the east boundary and along a line 50 feet south of the north boundary of the park. This line ran across the park between the two northernmost trailer spaces on each side of the service road. It was constructed on poles 35 feet in height, with the energized line on the bottom, at a height of 22 feet and 16/i6 of an inch from the ground, according to plaintiffs’ witnesses, or 23 feet 5*/2 inches from the ground, according to the defense witnesses.
The Naquin trailer was located on the west side of the service road in the second trailer space from the northern boundary of the park. The electric line in question was located 13 feet 4V2 inches horizontally north of the Naquin trailer and 12 feet 215/u inches vertically above the top of the Na-quin trailer.
The elevation of the hot line met the minimum requirements of the National Electric Safety Code that uninsulated electric lines over driveways, roads and residential areas be at least 20 feet above the ground. The code does not specifically prescribe a minimum height for trailer parks.
Plaintiffs’ expert witness, Dr. Ambrose Ramsey, testified that although the line met the minimum height required by the code, it would have been safer to install the *1318 line 25 to 30 feet high. He also suggested safer alternatives would have been to run the line along the northern property line, as originally planned, or to insulate it or place it underground.
Dr. Virgil Boaz, another expert for the plaintiffs, testified that the line as located across the trailer park between trailer spaces presented a safety problem in the erection of TV antennae. He agreed with Dr. Ramsey that safer alternatives would have been to locate the line along the north boundary, place it underground, insulate it, or raise it to a higher elevation.
On the other hand, defendant’s expert witness, Dr. Wayne Roelle, who had impressive credentials including membership on a working subcommittee which prepares and revises the National Electric Safety Code, testified that the line in question was in complete compliance with the National Code. He stated further he thought the line was reasonably safe because it was easily visible in daylight and it was not reasonably foreseeable that someone would raise a 27-foot antenna into the line during hours of darkness.
Mr. Roelle explained the difficulties and dangers involved in the other alternatives suggested by plaintiffs’ experts. As to placing the line underground, Roelle explained that an entirely new set of hazards are involved, such as existing underground pipes, people digging into the ground to place new pipes, putting metal fence posts down and placement of transformers and connections above ground where they would be dangerous to children. As to insulation, Roelle stated this was not advisable or practical because of the voltage involved and the short life of the insulating materials. As to placing the lines higher, Roelle explained the minimum clearances provided by the code are designed to place the lines out of the reach of the people engaged in normal activities. It is not contemplated that people are going to raise unusually high TV antennae or other such metal objects into a plainly visible line in a residential area or trailer park.
The most recent electrocution case decided by the Louisiana Supreme Court is Kent v. Gulf States Utilities Company, et al.,-So.2d-(La.1982). In that case an employee on a highway construction project was using a rake with a 30-foot aluminum pole to create antihydroplane grooves on the surface of the concrete. As he was working, the aluminum pole contacted Gulf States’ uninsulated electric line, located 25 feet 8 inches above the surface of the ground. Kent was seriously injured. In the trial court, a jury awarded plaintiff three million dollars, which was reduced as against Gulf States Utilities to the sum of one million dollars because of prior settlements with other defendants. The First Circuit Court of Appeal reversed on the grounds of Kent’s contributory negligence, i.e., the line was clearly visible to Kent, it had been pointed out to him shortly before the accident, and he knew it was there. The Supreme Court granted writs. In discussing liability under LSA-C.C. article 2315 (negligence) and liability under LSA-C.C. article 2317 (strict liability), the court stated these cases fall into three categories: (1) Negligence cases based on fault causing damage to another; (2) strict liability cases based on responsibility under Civil Code article 2317 for damage caused by a thing or an activity which is under a person’s control or in his custody; (3) absolute liability for ultra-hazardous activities such as blasting with explosives, pile driving, storage of toxic gas and crop dusting with airplanes.
In discussing liability for damages caused by things, the court explained the distinction between negligence cases and strict liability cases as follows:
“Because the term ‘thing’ encompasses a virtually unlimited range of subject matter, the Loescher [v. Parr, 324 So.2d 441] decision has since been cited by innumerable litigants seeking to avoid the necessity of proving personal negligence in tort cases. The distinction between negligence cases and strict liability cases (such as Loescher) has largely been either misunderstood or completely disregarded. It is therefore appropriate for *1319 this court, in determining the applicability of Art. 2317, to review first the distinguishing effect of applying strict liability under that article.
“In a typical negligence case against the owner of a thing (such as a tree) which is actively involved in the causation of injury, the claimant must prove that something about the thing created an unreasonable risk of injury that resulted in the damage, that the owner knew or should have known of that risk, and that the owner nevertheless failed to render the thing safe or to take adequate steps to prevent the damage caused by the thing. Under traditional negligence concepts, the knowledge (actual or constructive) gives rise to the duty to take reasonable steps to protect against injurious consequences “resulting from the risk, and no responsibility is placed on the owner who acted reasonably but nevertheless failed to discover that the thing presented an unreasonable risk of harm.”
“In a strict liability case against the same owner, the claimant is relieved only of proving that the owner knew or should have known of the risk involved. The claimant must still prove that under the circumstances the thing presented an unreasonable risk of harm which resulted in the damage (or must prove, as some decisions have characterized this element of proof, that the thing was defective). The resulting liability is strict in the sense that the owner’s duty to protect against injurious consequences resulting from the risk does not depend on actual or constructive knowledge of the risk, the factor which usually gives rise to a duty under negligence concepts. Under strict liabiiity concepts, the mere fact of the owner’s relationship with and responsibility for the damage-causing thing gives rise to an absolute duty to discover the risks presented by the thing in custody. If the owner breaches that absolute duty to discover, he is presumed to have discovered any risks presented by the thing in custody, and the owner accordingly will be held liable for failing to take steps to prevent injury resulting because the thing in his custody presented an unreasonable risk of injury to another.
“Thus, while the basis for determining the existence of the duty (to take reasonable steps to prevent injury as a result of the thing’s presenting an unreasonable risk of harm) is different in C.C. Art. 2317 strict liability cases and in ordinary negligence cases, the duty which arises is the same. The extent of the duty (and the resulting degree of care necessary to fulfill the duty) depends upon the particular facts and circumstances of each case.”
Under this analysis, the Supreme Court concluded that the Kent case involved negligence, not strict liability, because Gulf States, the owner of the thing, had knowledge of the electric line and any risk it created. The court held further that the case did not involve ultra-hazardous activities requiring application of absolute liability. The Supreme Court ultimately held in Kent that the Gulf States electric line over the highway did not constitute an unreasonable risk of harm. The decision of the Court of Appeal was affirmed on the basis that Gulf States was not negligent.
Applying the rules stated in Kent to the present matter, this is a negligence case, not a strict liability case, because Gulf States Utilities had actual knowledge of the electric line and any risk of harm it created. The issue is whether the line created an unreasonable risk of harm. After hearing all of the evidence as to the facts and circumstances of the accident, as described above, the nature and location of the line in question, and the conflicting opinions of the expert witnesses, the jury decided as a fact that the line did create an unreasonable risk of harm. We conclude the jury was not clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
On appeal, plaintiffs contend the judge’s charge to the jury was erroneous and inadequate and that the trial judge erroneously refused to give a special charge requested by the plaintiffs. We find nothing wrong with the judge’s charge, which included the following:
*1320 “. .. You are instructed that as a matter of law, a utility company, or any agency maintaining a potentially dangerous facility, such as electrical transmission lines is required to use the utmost care to reduce hazards to life as far as practicable and is liable for damages to any person who might forseeably contact the wire which creates the hazardous condition. Accordingly, a utility company is negligent where it has failed to take practical steps to reduce the hazard of the line by providing such clearance as is reasonably required for the reasonable, forseeable use of the surface below, by failing to insulate the line, or by its failure to provide guards to effectively isolate its line from accidental contact by persons using the surface below. However, an operator is not required to guard against hazards which could not be reasonably anticipated. A power company is not an insurer against all accidents which may occur involving its distribution lines and operation, however, the company is legally bound to safeguard against occurrences that can be reasonably expected or contemplated. Thus, the mere existence of electric transmission lines constitutes adequate notice of the fact that it does carry electricity, and absent some peculiar and unusual circumstances, the operator of such a line is not required to post warnings signs all along its lines or on all parts advising that the line is energized.”
The trial judge refused to give the following charge requested by the plaintiffs:
"The Court further charges you that electric utility company’s compliance with the minimum height provided in the National Electric Safety Code would not absolve an electric company from liability in all instances. In this respect, the Court charges you that you should note that the contingency of a TV antenna being raised in a trailer park to a height in excess of the minimum prescribed by the National Electric Safety Code would be reasonably anticipated, and that in such circumstances it is the duty of the electric company to provide for the safety of the public.”
The above charge requested by the plaintiffs is taken largely from the case of Thomas v. Gulf States Utilities Company, 128 So.2d 323 (La. 1st Cir. 1961, in which the court ultimately denied liability on the basis of the plaintiff’s contributory negligence. Without deciding whether the charge requested by the plaintiffs is a correct statement of the law, we conclude that the charges which were given by the trial judge were complete, proper and fair, and that the trial judge did not err in refusing to give the requested charge.
In a motion for a new trial, plaintiffs urged jury misconduct because several of the jurors were asleep during important portions of the trial. The judge held a hearing and took evidence on these charges of misconduct and concluded they had no merit. We find no abuse of the trial judge’s discretion in this regard.
For the reasons assigned, the judgment appealed is affirmed. All costs of this appeal are assessed against the plaintiffs-appellants.
AFFIRMED.
LABORDE, J., dissents and assigns reasons.